**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01550-KLM

ROBYN D. ROSS,

    Plaintiff,

    v.

PROFESSIONAL BUREAU OF COLLECTIONS OF MARYLAND, INC.; and,
PHILLIP JUSTUS; and,
TRAVIS JUSTUS

    Defendant.

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff, Robyn D. Ross, an individual, by and through counsel, CoakleyKrol, LLC, for its Amended Complaint against Defendants Professional Bureau of Collections of Maryland, Inc., a Maryland corporation; Travis Justus, an individual; and, Phillip Justus, an individual, hereby states and alleges as follows:

**JURSIDICTION AND VENUE**

1.    Robyn D. Ross ("Ross" or "Plaintiff") is a resident of the city and county of Denver whose current address (as of May 25, 2016) is 8903 E 24th Place, Unit 103, Denver, CO 80238.

2.    Defendant Professional Bureau of Collections of Maryland, Inc. ("PBCM") is a Maryland corporation in the business of consumer debt collection that is authorized to transact business in Colorado, who at all times relevant to this lawsuit employed more than

20 employees, and has its principal place of business located at 5295 DTC Parkway, Greenwood Village, CO 80111.

3. Defendant Phillip Justus is an individual who at all times relevant to this lawsuit was a member of the Board of Directors or President of PBCM and whose last known address is 1493 Fairfax Court, Castle Rock, CO 80104. Phillip Justice is an "employer" as that term is defined by Title VII of the Civil Rights Act of 1964 and 1991 and the FMLA.

4. Defendant Travis Justus is an individual who at all times relevant to this action was an owner, President, or member of the board of directors for PBCM, and whose last known address is 2345 Palmer Rd., Lake Havasu City, AZ 86406.  Travis Justice is an "employer" as that term is defined by Title VII of the Civil Rights Act of 1964 and 1991 and the FMLA.

5. Pursuant to C.R.C.P. 98(c), venue is proper in the County of Arapahoe, Colorado, as the Defendants, or any one of them, are residents of the County of Arapahoe at the time of commencement of this action.

## BACKGROUND

**6.** Ross incorporates herein by reference the allegations contained in Paragraph 1 through 5 above.

7. Ross was hired as General Counsel of PBCM on March 29, 2013 by Defendant Travis Justus, who was the owner, founder, and then President of PBCM.

8. As General Counsel, Ross's duties included:

      a.      Acting as department head and mentor for managers reporting from company departments including compliance, auditing, quality assurance, human resources and legal accounts;

      b.      Responding to EEOC complaints;

      c.      Managing outside counsel;

      d.      Renewing collection licenses in states where required; and

      e.      Filing annual reports in states where required.

9.      During the course of Ross's employment with PBCM, Ross implemented major cost saving and risk reducing to PBCM, including but not limited to, the following:

      a.      Began drafting EEOC position statements in-house, rather than employing outside counsel, saving PBCM approximately $10,000.00 per incident.

      b.      Properly contesting unemployment claims (instead of having the bookkeeper respond, a strategy rarely successful) and winning at a rate of approximately 95%, saving PBCM approximately $100,000.000 annually.

      c.      Designed and implemented litigation defense policies to cut annual outside counsel defense fees by approximately $150,000.00.

      d.      Reduced costs for consumer litigation by approximately 50% annually through risk assessment, aggressive pre-suit negotiation and strategic "nuisance" settlements.

      e.      Implemented proactive policies that resulted in a significant decrease of the total number of lawsuits filed against PBCM during her tenure.

10. During her employment with PBCM, Ross was a mother of two young children with serious health conditions; her son has potentially deadly, anaphylactic nut and peanut allergies while her daughter had total blindness in one eye which required special ophthalmological treatment.

11. Throughout her employment with PBCM, Ross recalls missing a total of *one* day of work (April 22, 2014, due to food poisoning, for which she properly notified Defendant Travis Justus); additionally, Ross only rarely took parts of days off to care for her children when there was absolutely no alternative.

12. Defendant Travis Justus, despite allowing Defendant Phillip Justus and his son, Matthew Justice, to come and go as they pleased, did insist on other employees being on time to begin work.

13. Due to PBCM's failure to draft or provide a written job description for General Counsel, or because the position inherently needed no fixed hours, Ross had no official "start time" as part of her job description.

14. Ross and Defendant Travis Justus occasionally adjusted Ross's "schedule" to accommodate Ross's childcare needs and so that Defendant Travis Justus had an understanding as to what Ross's arrival and departure times would be.

15. Defendant Travis Justus and Ross agreed that if she even thought she might be even a minute late for any reason, that it was not a problem, and she needed to simply text one of them; a procedure Ross followed on each occasion where she even thought she might be late, with most of those texts being sent in an abundance of caution where she was not late after all.

16. Throughout the course of her employment for PBCM, Ross never worked less than forty (40) hours per week, and often worked late and weekends putting her real time worked far in excess of forty (40) hours per week.

17. Even in the very beginning of her employment with PBCM, Ross began to notice examples of PBCM's culture of hostility to female employees.

18. In May of 2013, Ross witnessed PBCM Vice President of Operations, Eric Brechbill (approx. 6'5", over 300 lbs), publicly berating and humiliating a twenty year old female employee (approx 4'11", 110 lbs) by screaming inches from her face.

19. Upon witnessing this exchange, Ross intervened and instructed Eric Brechbill to come to her office; he then began yelling at Ross in a similar fashion while Ross walked to her office.

20. Ross informed Eric Brechbill that his behavior was entirely unacceptable, to which he responded by demanding they call Defendant Travis Justus together; the call was made but not answered, and Eric Brechbill left her office.

21. Horrified by the incident, Ross spoke about it to Defendant Travis Justus later in the day, expecting an equally stunned reaction; instead, Defendant Travis Justus was not interested in the details and simply wanted to know if it was over, and Ross confirmed that it was.

22. Ross also witnessed similar abusive encounters from male managers and executives towards female employees, including an incident where Defendant Travis Justus instructed a female employee to "stop being a pussy," and multiple incidents of inappropriate sexual innuendo being directed at female employees, including Ross.

23. On one occasion, Ross became aware that an email was found on a company printer where Defendant Travis Justus's son, Matthew Justice, spoke about a female compliance officer being "frigid" and referenced himself and Defendant Travis Justus' executive assistant engaging in sexual relations.

24. On multiple other occasions, Defendant Travis Justus and other male executives and managers made derogatory or discriminatory comments about or to Ross, including:

   a. Defendant Travis Justus instructed Ross to "smile more" at a hostile tenant in the building which Defendant Travis Justus owned;

   b. Defendant Travis Justus made a comment in front of the reception staff concerning Ross's figure (saying she was "not fat, but a good sized woman");

   c. Defendant Travis Justus, when speaking with Ross about a food Ross mentioned was high in protein, looked at Ross and asked, "you know what else is high in protein," a reference to semen/oral sex;

   d. After Ross had slipped on ice outside of the office on a morning where maintenance had failed to shovel and salt the sidewalk, Defendant Travis Justus, in response to seeing her torn pant leg and bleeding knee told her, "good, I never liked pants on you in the first place."

   e. Defendant Travis Justus would loudly discuss sexual enhancement procedures he was undergoing (penis injections, etc.) while knowing Ross was within earshot.

      f.      Defendant Travis Justus told Ross, "I know you're not stupid, you're just so feminine, but that's fine, you're a woman."

      g.      Defendant Travis Justus forbade Ross from even being friends with a subordinate female employee despite the fact that Defendant Travis Justus, Eric Brechbill, and Matthew Justice all had sexual relationships with subordinate employees.

25.      In addition to the abusive language and hostility towards female employees, Ross was aware of incidents of male executives and managers making romantic advances toward, and engaging in sexual relationships with, female subordinates; specifically, Defendant Travis Justus began dating a female manager but attempted to hide the relationship despite making sexually explicit phone calls to her on recorded lines; Eric Brechbill secretly dated at least one female subordinate; Defendant Phillip Justus made unwanted sexual advances to a receptionist over email.

26.      Ross experienced multiple examples of humiliating sexual harassment during her employment with PBCM, including Defendant Phillip Justus's habit of blatantly rubbing his genitals through his pants while speaking with female employees, including Ross.

27.      Per company policy, each and every one of these incidents detailed here was reported by Ross to either Defendant Travis Justus, who would be upset with Ross for mentioning them, or Russ Ray, head of Human Resources, whose normal response was to say nothing and excuse himself from the room.

28.      By 2014, Ross understood that she would be subject to hostility in the form of yelling, cursing, or sexual innuendo on a near daily basis.

29. After the initial incidents, Ross began to withdraw from interaction with the male staff as much as possible and try to work in her office with the door closed.

30. In 2014, Ross experienced callousness and pushback for dealing with her child's emergencies; including the following incidents:

    a. On October 25, 2013, Ross's son woke up at 1:00 a.m with severe croup and was rushed to the ER where he was not discharged until 5:00 a.m.; Ross texted Defendant Travis Justus at 2:00 a.m. advising him she may be late, and then subsequently texted him at 7:00 a.m. advising that she would be in to work at 9:30 a.m.; rather than the normal 8:00 a.m.  Upon her arrival to work at 9:30 a.m., Defendant Phillip Justus, who Ross did not report to and who had no role at PBCM at the time other than a position on the board, had Ross "written up" in her personnel file for being late.  Ross advised Defendant Travis Justus that she did not appreciate Defendant Phillip Justus's action toward her, especially considering that she texted as agreed upon.  Defendant Travis Justus advised her that everyone gets written up for being late, even Defendant Phillip Justus.  Defendant Travis Justus stated that the executive assistant, who could not view the parking lot or entrance to the building from her desk, had written up Defendant Phillip Justus for being late.  Ross immediately checked Defendant Phillip Justus's personnel file and found zero (0) write-ups as to him being late, despite Ross personally witnessing (from her office that overlooked the parking lot) Defendant Phillip Justus being between 90 minutes to 3 hours late each day Defendant Travis Justus

was known to be out of town, which was commonly up to 3 weeks out of every month.

      b.     In January 2014, Ross received an urgent call from her son's school advising her that he wasn't doing well.  Ross advised Defendant Travis Justus of the phone call.  Ten minutes later, the school called back advising her that her son had gone into anaphylactic shock and had his life saved with an injection of epinephrine.  Ross advised Defendant Travis Justus that she must leave immediately to get to the hospital.  Defendant Travis Justus's only response was to inquire as to whether Ross had completed a task and put it in the mail.

      c.     In June 2014, after Russ Ray failed to process her vacation request that had been submitted some 30 days prior, Ross requested to take a vacation day off to travel to New York to take her son to see an allergy specialist.  Defendant Travis Justus's only response was to ask if she could not use a vacation day and instead only take a half day off because her flight was in the afternoon.

      d.     In October 2014, after Defendant Travis Justus had retired and appointed Defendant Phillip Justus as the new President of PBCM, Ross requested to attend a short meeting a few days later at her son's school to speak to the faculty and staff about an emergency plan in the event her son experienced an anaphylactic allergy attack.  Defendant Phillip Justus became enraged saying, "you can't spring these things on me," and demanded to

know what other dates Ross would be out of the office. Ross explained that she had just been informed of this meeting and it was an important, one-time conference for her son's safety at school, and two days' advance notice was not springing the meeting on him. Defendant Phillip Justus continued to complain that this meeting, scheduled for several days later, was equivalent to springing a request for time off on him.

   e. In December, 2014, after Russ Ray again failed to process her vacation request that had been submitted some 30 days prior, Ross sent an email to Defendant Phillip Justus on December 18, 2014, reminding him that she would be out of the office on December 19, 2014. Defendant Phillip Justus became enraged and accused her of failing to give notice and demanding to know what she would be doing, despite male executives taking well more than their allowable time and never being hassled for it.

31. Subsequent to the October 2014 incident detailed above, Ross began to realize that Defendant Phillip Justus would be even worse than Defendant Travis Justus when it came to her responsibilities as a parent; thus, she decided to file Family Medical Leave Act ("FMLA") paperwork to ensure that her job was not in jeopardy on the days she needed to tend to her children's disabilities and the responsibilities that came with them.

32. Defendant Travis Justus, still involved with PBCM as Chairman of the Board of Directors, learned of Ross's intent to file FMLA paperwork and advised her that it was inappropriate use of the FMLA and she should not file it.

33. On December 9, 2014, Ross filed her FMLA paperwork with Russ Ray in his

capacity as head of Human Resources. She also informed him, again, she felt targeted by the male executives and management due to being a woman and mother. She requested that Russ Ray document this complaint of being held to a different, higher standard due to being a woman and being the only executive at PBCM with small children. Instead of creating the complaint, Russ Ray responded by writing a memo describing the interaction as Ross having "gone on a tirade."

34. A few hours later, Defendant Travis Justus received the hyperbolic memo and advised Ross that it was inappropriate to complain to Human Resources that policies were being unevenly enforced; he then told Ross she better "watch herself," an event marking the beginning of PBCM's retaliation against Ross, including sabotaging her and attempting to force her to quit.

35. Immediately after telling Ross to "watch herself," Defendant Travis Justus demanded that all state regulatory license renewals be put on his desk so he could "review" her work.

36. Over the following two weeks, Defendant Travis Justus began returning the license renewals to Ross piecemeal (with coffee and food stains on them), and in fact lost some of the paperwork, but did not inform Ross of this. One of the states he failed to return was the license renewal for Nebraska.

37. In January of 2015, Ross inquired with the Nebraska Collection Licensing Agency Board as to why PBCM had not received their renewed paper license. She was informed that the renewal application had not been received

38. Ross promptly informed Defendant Phillip Justus that PBCM could not and

should not operate in Nebraska until the license was renewed, which would be in April at the earliest.

39. In December of 2014, subsequent to Ross filing the FMLA paperwork, Defendant Travis Justus, Defendant Phillip Justus, and Matthew Justice began to retaliate by openly taunting and bullying Ross.

40. In December of 2014, subsequent to Ross filing the FMLA paperwork, Defendant Phillip Justus retaliated by directing the system administer to access Ross' computer to access her LinkedIn profile and print messages between her and her predecessor, Greg Gerkin, discussing the inappropriate sexual relationships at PBCM.

41. Ross's first paycheck after filing the FMLA paperwork docked her vacation time in retaliation for her having to pick up her son (who had vomited) from school in the middle of the day.  The policy for executives for the entire time Ross had been employed with Defendant PBCM was that short time missed from work for family illness/emergencies did not need to be noted as vacation time.  When Ross asked about this discrepancy, Defendant Travis Justus told her he docked her on this occasion because she filed FMLA paperwork.  His words were, "You're the one that turned that paperwork in, otherwise I wouldn't have done that to you."  At no point in time did Ross claim the vomiting was due to her son's disability or that she was taking FMLA leave. In fact, Ross was with Defendant Travis Justus at a meeting with outside counsel when she received the message from the school nurse, ensuring Defendant Travis Justus was very clear on the fact the incident was not FMLA related.

42. Defendant Phillip Justus screamed at Ross for informing him she had a

reserved vacation day to take her son to the doctor in a few days, claiming it wasn't on his "list." Ross said that he approved it so it should be on his "list," and when they checked the list, the vacation day was on the list as approved in October.

43. In January of 2015, Ross was singled out with a new "policy" forbidding cell phones on the executive floor, despite the fact that Ross's cell phone was the only way for her to be directly contacted in case of emergency. Ross later discovered that she was the only employee on the executive floor that this new "policy" applied to as it contained a clause that exempted every other PBCM executive, including her own executive administrative assistant.

44. On January 24, 2015, a member of Defendant PBCM's Board of Directors sent Ross an email that began by stating, "In this male-dominated passive/aggressive company of which I am a part, we need to stop and breathe deep." Ross properly interpreted this message as mocking her in light of her history of reporting discriminatory and inappropriate behavior by the male staff.

45. In January of 2015, after being promoted to the role of Vice President of Business Development, Matthew Justice began taunting Ross by entering her office and demanding the status of documents that were of no consequence to him. He would speak condescendingly and attempt to intimidate her by standing over her stating, "I'm your boss and you have to do whatever I say." On one occasion, Ross felt physically threatened and attempted to leave the office. In response, Matthew Justice moved abruptly to block the doorway and keep Ross from exiting, and in so doing, made physical contact with Ross, causing her fear and humiliation, as well as a belief that she was trapped. Ross was left

physically shaking and crying after this encounter.

46. When Ross reported the assault by Matthew Justice to Defendant Phillip Justus, she was told (by being yelled at in front of her subordinates and Matthew Justice) that Matthew Justice is an owner of Defendant PBCM and if he tells her to do anything she better do it, including getting down on the floor on her hands and knees and assembling furniture if that's what they told her to do, and if she had a problem with that then she could quit.

47. In January of 2015, Defendant Phillip Justus asked Ross if there was any man in the company she "didn't have a problem with." Ross answered that she had no problems with anyone that spoke respectfully. He responded by saying, "This isn't the right job for you if you don't like being talked to in that way." When Ross turned to leave she saw Matthew Justice laughing at her as she walked out of the office.

48. On Sunday, February 1, 2015, Ross sent an email to Defendant Phillip Justus advising him that her son had an anaphylactic allergy attack at church and that she might be late the next day.

49. A few days later, Ross was terminated and given a letter that explained the basis for her termination.

50. The letter stated three reasons for her termination:

    a. The Nebraska license paperwork, which was entirely the fault of Defendant Travis Justus taking the paperwork from Ross's desk "to review;"

    b. The failure of Ross to file an Answer to a California Labor Commission matter, despite the fact that an Answer was not due or even appropriate to file; and,

      c.      The lack of representation at a California Labor hearing, when in fact Ross had confirmed that an employee would be present (an employee who later stated he forgot about it) and Ross was in the hospital with her disabled child on what was clearly FMLA leave.

51.    Defendant Travis Justus had previously complained to Ross about the cost of dependents to Defendant PBCM, specifically the impact that Defendant Phillip Justus' daughter was having on insurance premiums.

52.    Subsequently, Defendant PBCM provided false information (by mutating the reasons for her termination and inventing responsibilities that belonged to Ross, such as driving new hires to the police station to be fingerprinted) to the Colorado Department of Labor in an effort to prevent Ross from receiving unemployment benefits, and in so doing, provides additional evidence of pretext related to Ross's termination.

53.    Contemporaneously with the ongoing discrimination, sexual harassment, and retaliation occurring at Defendant PBCM throughout her time there, Ross confided in other PBCM employees (including but not limited to Ariadna Trillo, Jennifer Holmes, Kayla Neff, Alicia Schouten, Jeb Judy, and Nancy Moreno) and attorneys in the community (including but not limited to Christine Samsel and Bill Berger [at a Brownstein Hyatt Farber Schreck, LLP Christmas party/CLE event on November 19, 2014], John Keen, Jon Bourne, Carol Coates, and Ross' own predecessor Greg Gerkin [on different occasions]) as to what was happening to her at Defendant PBCM.

## FIRST CLAIM FOR RELIEF
*(Violations of Title VII of the Civil Rights Act of 1964 and 1991 – Defendants PBCM, Travis Justus, and Phillip Justus)*

54. Ross incorporates herein by reference the allegations contained in Paragraph 1 through 53 above.

55. As detailed above, Defendants PBCM, Phillip Justus, and Travis Justus created a hostile work environment and discriminated against Ross in the terms and conditions of her employment because of Ross's sex and because Ross opposed their unlawful harassment and discrimination.

56. As detailed above, the unlawful actions and practices of Defendants PBCM, Phillip Justus, and Travis Justus were retaliatory in response to Ross's proper opposition to the Defendants' discrimination and harassment.

57. As a result, Ross is entitled to her damages in amount to be proven at trial, plus her cots and reasonable attorney's fees.

58. Ross exhausted all administrative remedies prior to fling this action and received her notice of right to sue on or about February 18th, 2016.

## SECOND CLAIM FOR RELIEF
*(Violations of FMLA – Retaliation– Defendants PBCM, Travis Justus, and Phillip Justus)*

59. Ross incorporates herein by reference the allegations contained in Paragraph 1 through 69 above.

60. Ross engaged in the protected activity of filing for FMLA in regard to her children's medical issues on or about January 30, 2016.

61. Ross requested FMLA leave on February 1, 2015 to attend to her son's anaphylactic allergic reaction.

62. As detailed above in paragraphs 41-50 and as a result of Ross requesting FMLA leave, Defendants took materially adverse employment actions against Ross in retaliation for her filing her FMLA claim. in an attempt to dissuade her from filing for FMLA and from using the rights afforded to her by the FMLA.

63. Defendants took the adverse actions detailed above because Ross engaged in the protected activity of filing for FMLA.

64. Ross was eligible for and entitled to FMLA protections.

65. Defendant PBCM was covered by the FMLA.

66. Ross was entitled to leave under the FMLA.

67. Ross provided sufficient notice of her intent to take leave.

68. Defendants denied Ross the FMLA benefits she was entitled.

69. The circumstances permit an inference of causal connection between Ross taking FMLA leave and Defendants' materially adverse action against her.

70. As a result, Ross is entitled to her damages in amount to be proven at trial, plus her cots and reasonable attorney's fees.

## THIRD CLAIM FOR RELIEF
### (FMLA – Interference – Defendants PBCM, Travis Justus, and Phillip Justus)

71. Ross incorporates herein by reference the allegations contained in Paragraph 1 through 70 above.

72. Ross requested intermittent FMLA leave in regard to her children's medical

issues on or about January 30, 2016.

73.Ross requested leave on February 1, 2015 to attend to her son's anaphylactic allergic reaction. .

74.Ross engaged in the protected activity of filing for FMLA.

75.As detailed above in paragraphs 41 - 50 and as a result of Ross requesting FMLA leave, Defendants retaliated against Ross and took materially adverse employment actions against Ross in an attempt to interfere and dissuade her from filing for FMLA and from using the rights afforded to her by the FMLA.

76.Ross was eligible and entitled to FMLA protections.

77.Defendant PBCM was covered by the FMLA.

78.Ross was entitled to leave under the FMLA.

79.Ross provided sufficient notice of her intent to take leave.

80.Defendants denied Ross the FMLA benefits she was entitled.

81.The circumstances permit an inference of causal connection between Ross taking FMLA leave and Defendants' materially adverse action against her.

82.As a result, Ross is entitled to her damages in amount to be proven at trial, plus her cots and reasonable attorney's fees.

**JURY DEMAND**

Plaintiff requests a jury trial of all issues so triable.

WHEREFORE, Plaintiff Robyn R. Ross respectfully requests that this Court enter judgment in her favor and against Defendants Professional Bureau of Collections of Maryland, Inc., a Maryland corporation; Travis Justus, an individual; and, Phillip Justus, an individual; jointly and severally, in an amount to be established at trial, together with interest, costs, and attorney's fees, and for such other and further relief as the Court deems just and proper under the circumstances.

Dated this 5th day of August 2016.

**COAKLEYKROL, LLC**

*s/ Eric R. Coakley*

_____

Eric R. Coakley, CO Bar #34238
2373 Central Park Blvd. - Suite 100
Denver, CO 80238
coakley@coakleykrol.com
(303)803-1611

## *CERTIFICATE OF COMPLIANCE*

The undersigned hereby certifies that on August 5, 2016, I filed a copy of the foregoing Amended Complaint via the Courts CM/ECF system and at the same time requested an electronic copy be served on the following:

Kristi L. Blumhardt
McElroy, Deutsch, Mulvany & Carpenter LLP
5600 S. Quebec St. - Suite C100
Greenwood Village, CO 80111
kblumhardt@mdmc-law.com

*s/ Eric R. Coakley*

_____
Eric R. Coakley