Transcript of the Testimony of

## ROBYN D. ROSS
**August 8, 2017**

Robyn D. Ross
v
**Professional Bureau of Collections, et al.**

# Diane Scholl, RMR

*Diane Scholl, RMR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



Page 5

1    occasion?

2         A.   No.

3         Q.   Just to remind you -- I'm sure prior counsel

4    went through rules of deposition, and I know that

5    you're an attorney yourself, but just to remind you

6    that your testimony today is under oath.  You

7    understand that, correct?

8         A.   I do.

9         Q.   And that the court reporter's taking down all

10   of the questions and answers, so it's important that we

11   try not to talk over each other, and that you let me

12   finish my questions, and I in turn need to let you

13   finish your answers, okay?

14        A.   Okay.

15        Q.   Sometimes that's difficult because of the way

16   that people converse, but if we have trouble with it,

17   I'm sure the court reporter will remind us, and I'll

18   try and remind you, as well, if you start to answer

19   something before I think my question is finished.

20   fair enough?

21        A.   Yes.

22        Q.   Have you taken anything today that would

23   impact your ability to fully and accurately questions

24   today?

25        A.   No.

Robyn D. Ross
Professional Bureau of Collections, et al.

ROBYN D. ROSS
August 8, 2017

Page 88

1    not recalling right now?  Is that -- I mean, if it

2    comes -- if -- sometimes people's recollection comes

3    back.

4         A.    Yeah, it could come to me.

5         Q.    Yeah.

6         A.    As we talk, it could come back to me.

7         Q.    Okay.  So you -- there was one incident that

8    you're not recalling right now.  You turned in to PBCM

9    that -- the FMLA paperwork signed by Dr. Atkins,

10   correct?

11        A.    Correct.

12        Q.    And when did you turn that in to PBCM?

13        A.    I believe it was at the beginning of the

14   second week of December 2014.

15        Q.    Second week of December 2014.  And were there

16   any -- did you ever request FMLA leave after you turned

17   in that paperwork?

18        A.    Yes.

19        Q.    When did you ask for leave?

20        A.    It was via notification, an e-mail from

21   Children's Hospital after my son was admitted for

22   anaphylactic shock, and it would have been either

23   January 1 or February -- I'm sorry, January 31 or

24   February 1, 2015, thereabouts.

25        Q.    And you said from Children's Hospital.  Like

Page 89

1    **Children's Hospital sent something, or you were at**

2    **Children's Hospital?**

3        A.   I was physically in the room where my son was

4    admitted overnight, Children's Hospital.

5        **Q.   So you were at Children's Hospital, and you**

6    **sent an e-mail to --**

7        A.   Phillip.

8        **Q.   Okay.  And you said, "I need to take FMLA**

9    **leave"?**

10       A.   No.  I notified him that my son had gone into

11   anaphylactic shock, and that I was going -- something

12   like I might not be there tomorrow, or I might be late

13   tomorrow, something like that.

14       **Q.   And that -- the date would actually be the**

15   **date of the e-mail, correct?**

16       A.   Correct.

17       **Q.   I mean, we can check that.**

18       A.   Correct.

19       **Q.   Yeah.  And he was supposed to know that that**

20   **was a request for FMLA leave?**

21       A.   Yes.

22       **Q.   Okay.**

23       A.   I had also informed some -- I believe that I

24   was alone, that my husband was out of state.  I had

25   left my daughter with a neighbor, so I had -- I had no

Page 91

 1       Q.    So January 31 or February 1, you sent an

 2   e-mail saying that you were going to be out for some

 3   period of time relating to your son's peanut allergy?

 4       A.    Yes.

 5       Q.    And was there a problem with taking that time

 6   off?  I mean, did anybody complain to you about that,

 7   or --

 8       A.    I was fired a week later.

 9       Q.    But my question is, did anybody say anything

10   to you like, "You can't take this time," or anything in

11   relation to that?

12       A.    Phillip doesn't respond to -- you know,

13   there's no "Get well soon."  There's no response to

14   something like that.  It's just dead air.

15       Q.    So the answer, then, is there were -- there

16   was not an issue in relation to somebody saying, "You

17   can't take the time off," or any problem in that

18   regard?

19       A.    I mean, the issue was it was stonewalling

20   rather than an acknowledgement that my son almost died.

21   It was just dead air.  The message is received.

22       Q.    Because he didn't say, "I hope he's well"?

23       A.    A single word.  He didn't acknowledge

24   receiving it, to my knowledge, or -- or if it was, it

25   was something like, "Okay," something -- just not at

Page 92

 1    all what you would expect in that type of life-

 2    threatening situation.

 3         Q.    **And then you said you were fired a week later?**

 4         A.    Yes.

 5         Q.    **And didn't you take time off in between --**

 6         A.    Yes.

 7         Q.    **-- after that?**

 8         A.    I -- yes, I did.  A vacation paid time off.

 9         Q.    **And was that vacation time submitted -- the**

10    **request for vacation time submitted pursuant to PBCM**

11    **guidelines?**

12         A.    Yes.  It was contemporaneous with me

13    purchasing airline tickets, which would have been

14    December 2014.

15         Q.    **And who did you give that paperwork to?**

16         A.    I left it on Russ Ray's desk.

17         Q.    **And you understand that he said he never**

18    **received it?**

19         A.    So I do understand that Russ said that.  It

20    was an ongoing chronic problem at PBC that vacation

21    requests were not processed in a timely manner.  They

22    were received and filed away rather than -- the

23    procedure required an approval signature, and then the

24    vacation date of every employee on vacation for that

25    week was supposed to be put on a list, which was then

Page 96

1    termination would have been the last day.  So between,

2    let's say, January 31 or February 1, when my son was

3    hospitalized, I returned from vacation, and was

4    terminated February 9th.

5         **Q.   Was that the date that you returned from**

6    **vacation --**

7         A.   Yes.

8         **Q.   -- that you were terminated?  And what were**

9    **you told about your termination?**

10        A.   I was given a letter.  I wasn't told verbally

11   much.  I walked into the lobby.  Phillip was standing

12   there, and he said, "Hey, will you come into the

13   conference room," and I said, "Sure."  And I came in

14   and sat down, and Russ came in and had the box of my

15   office contents, and Phillip said, "We've decided to go

16   in a different direction," and then he gave me a letter

17   spelling out three reasons why I was being terminated,

18   and he asked if I had any questions, and I said no, and

19   then we said good-bye.

20        **Q.   Did you talk to Travis Justus that day?**

21        A.   No.  By then, Travis was living in Lake

22   Havasu.

23        **Q.   Do you think Travis had anything to do with**

24   **your termination?**

25        A.   I don't know.  I know that Travis -- that

Page 97

```
 1    Phillip had terminated people.  He terminated his a --
 2    middle administrative assistant without permission, and
 3    that upset Travis, so I know that Phillip wanted to
 4    take his role autonomously and operate without Travis's
 5    approval on terminations.
 6             I know that the letter that I was given was
 7    something Travis Justus wouldn't have done ever.
 8    There's a zero percent chance that he would have given
 9    a letter that spelled out this is why you're being
10    terminated, so I knew Travis had nothing to as do with
11    me receiving that letter.
12             So I just knew those two facts.  Phillip
13    wanted to operate autonomously.  Travis would never
14    have approved a writing.  Those two things I knew.
15    That's all I knew.
16        Q.    But Travis wasn't involved with the company at
17    that time.  He was no longer president, correct?
18        A.    Right.  Chairman of the board.  So I would
19    have to -- in my assumption, I would have to assume
20    that -- that Travis did not give the approval for that,
21    but I'm just guessing.
22        Q.    But Travis wouldn't have approval?  I mean,
23    just because somebody's the chairman of the board, they
24    don't get involved in the daily --
25        A.    You would --
```

Robyn D. Ross                                                    ROBYN D. ROSS
Professional Bureau of Collections, et al.                       August 8, 2017

Page 143

 1    responsibilities?

 2        A.    Correct.

 3        Q.    Okay.  I'm also confused about whether you're

 4    claiming a disparate treatment or hostile work

 5    environment, or both.

 6             MR. COAKLEY:  Object to form.  Calls for a

 7    legal conclusion.

 8        A.    I don't know that hostile work environment was

 9    something in our complaint, so I can't answer your

10    question.

11        Q.    (BY MS. BLUMHARDT)  Well, I mean, sitting here

12    today, do you think that it was a -- you know, this is

13    your charge.  You're looking at the charge.  And forget

14    about the complaint.  But looking at your charge, do

15    you see that you're claiming a sexual hostile -- a

16    hostile work environment as part of your sex

17    discrimination claim?

18        A.    No.  It's not written here.

19        Q.    Okay?  So let's then go with this -- the

20    disparate treatment relating to your gender not related

21    to your caregiving responsibilities.

22        A.    Um-hum.

23        Q.    So the first one is "making derogatory sexual

24    comments to and about women and other members" -- I'm

25    sorry -- "and mothers at PBCM, including me."

Page 200

1      A.    Yes.

2      Q.    Do you believe that this absenteeism and

3   tardiness policy applied to you when you were an

4   employee at PBCM?

5      A.    Yes.

6            (Deposition Exhibit 5 was marked.)

7      Q.    Then I've handed you now Exhibit No. 5, which

8   is titled "Operations Procedure No. P-15, Sexual

9   Harassment Policy."  Ask that you take a look at this

10  document, and let me know when you've had a chance to

11  do so.

12     A.    Okay.

13     Q.    Are you familiar with Exhibit No. 5?

14     A.    Yes.

15     Q.    On the second page of Exhibit No. 5, again,

16  there's a signature, your name.  Is that your

17  signature?

18     A.    Yes.

19     Q.    And did you sign this on March 29th, 2013?

20     A.    Yes.

21     Q.    Did you watch the video that was provided

22  regarding the sexual harassment policy?

23     A.    I don't remember.

24     Q.    All right.  I'd like to focus on the second

25  page of this exhibit, "Reporting harassing conduct to

Robyn D. Ross                                                    ROBYN D. ROSS
Professional Bureau of Collections, et al.                       August 8, 2017

Page 201

1    the company."  In the first paragraph, it says, "If you

2    believe you have been harassed or have witnessed an

3    incident of harassment, submit an oral or written

4    complaint to your own or any PBC manager or management

5    within three calendar days of the offense."

6        A.    Um-hum.

7        Q.    Do you see that?

8        A.    Um-hum.

9        Q.    Did you ever report any harassment to a PBC

10   manager or management within three days of the alleged

11   offense?

12       A.    Yes.

13       Q.    And what was that?  When was that, I should

14   say?

15       A.    It would have been me witnessing the

16   harassment of Ari Trillo in May of 2014.  It would have

17   been in January -- on January 28th, 2015, I wrote up

18   Matt Justus for -- for harassing Ari Trillo.  When she

19   worked at ADS, he was on the phone with her, yelling at

20   her, telling her to do something she didn't want to do,

21   and when she said no, he said, "Well, then that's the

22   benefit of being your boss is that you have to do

23   everything I tell you to," which he's not her boss.

24   He's not anyone's boss.  And then he hung up on her.

25   And I wrote him up for that.

Page 202

1      Q.    He was an ADS employee, correct?

2      A.    Who?

3      Q.    Matt Justus?

4      A.    No.  He was a PBC employee.

5      Q.    Oh, I thought you said --

6      A.    Ari at that time was a -- Ari Trillo was the

7  ADS employee.

8      Q.    So Matt was working for PBCM, she was working

9  for a different company, and he did this to --

10     A.    Her.

11     Q.    -- her, but she was not at the same company?

12     A.    Correct.  I wrote up his behavior.

13     Q.    Okay.

14     A.    Um-hum.  Yeah.

15     Q.    And that was in relation to something he did

16  with her, not with you, correct?

17     A.    Correct.  But I also --

18     Q.    It was something you witnessed?

19     A.    Correct.  But this is on the same day,

20  January 28th, 2015, I also wrote him up for physically

21  intimidating me from leaving my office and blocking my

22  way of getting back in.

23     Q.    Okay.  And tell me about that incident.

24     A.    He was new to our floor.  His office was

25  somewhere on my right.  And I was working on something

Page 203

1    for the Coast Guard.  It was a boat that we were trying

2    to take possession of.  It was extraordinarily

3    complicated.  I worked on this sometimes, when I could,

4    all day long, for weeks and weeks on end.

5            And he had come in, and he had begun to

6    micromanage, "Is that done yet?"  And I had 45

7    documents out on my desk, and I told him, "No, it's

8    not.  It's not" -- my answer was something like "You

9    see that I'm working on it right now."  And he came

10   back, "So is it done yet?"  And I said, "You're being

11   redundant, of course.  You're being rhetorical.  You're

12   looking right here at the work."  "So is it done yet?"

13   And he began to just delve into this micromanaging,

14   condescending, and he wouldn't stop doing it.  And I

15   told him to leave my office, and he was yelling at me,

16   "Is it done yet?"

17           And so I get up, and I said, "I'm going to go

18   talk to Phillip."  And Phillip's office was Travis's

19   old office now on my left, and Matt said, "Go ahead.

20   Phillip's not here."  And I look, and Phillip's door

21   was open, and the desk was empty.

22           And I turned around and tried to get back into

23   my office.  Both coming and going, he's over 6 feet

24   tall, and he's completely blocking the door so that I'm

25   having to duck into my own door and squeeze -- like

Page 204

1  physically touch him to get into my office, and once I

2  get in, I shut the door and I locked it.  And then he

3  stood at the glass window in front of it, yelling at

4  me, and I wrote him up for treating me that way.

5      Q.    Okay.  And anything else?

6      A.    Not that I can recall at this time.

7      Q.    I believe earlier you testified, please

8  correct me if I'm wrong, that you only missed one day,

9  one full day from work due to illness?

10     A.    Yes.

11     Q.    You also missed days for vacation, correct, or

12 personal time off, whatever it may have been for?

13     A.    Sure.

14     Q.    Personal time off, right?

15     A.    Yes.

16     Q.    Did you miss days when your children were

17 sick?

18     A.    Not a full day of work, no.

19     Q.    Were you late to work for reasons other than

20 your children?

21     A.    I would be late to work sometimes between 1

22 and 15 minutes because of traffic or fresh snow on the

23 ground that caused traffic.

24     Q.    Did that happen on a weekly basis, monthly

25 basis?

Page 209

1      Q.    Did you ever respond to comments about any of

2    your blogs while you were on company time?

3      A.    I have no idea.  I can't fathom that I did at

4    all.  It wasn't necessary.  No.

5      Q.    Did you ever access articles that you wrote

6    that were -- blogs that you wrote that were not related

7    to PBCM while you were at PBCM, physically at PBCM

8    during work hours?

9      A.    It's highly unlikely, but possible that maybe

10   infrequently.  I have no idea.

11     Q.    What are the damages that you are seeking in

12   this lawsuit?

13     A.    I don't know the damages off the top of my

14   head.

15     Q.    Ma'am, I'm asking you, not your counsel.

16     A.    I'm sorry?

17     Q.    I'm asking you, not your counsel.

18     A.    And I'm answering you.  I don't know the

19   answer off the top of my head.  We have the complaint

20   right here.  Would you like me to read it?

21     Q.    There's not -- there are no damages in the

22   complaint.

23     A.    Okay.

24     Q.    You understand that as part of your disclosure

25   requirements, you're required to set out damages --

Robyn D. Ross                                          ROBYN D. ROSS
Professional Bureau of Collections, et al.             August 8, 2017

Page 210

    1       A.    Yes.

    2       Q.    -- and you calculation of damages?

    3       A.    Yes.  I do remember doing that worksheet for

    4    Rachel Ellis.

    5       Q.    Okay.

    6       A.    I don't recall what the number is.

    7       Q.    I'm talking about in the lawsuit.

    8       A.    It's not the same --

    9       Q.    Forgive me I'm wrong.  If you -- I'm not sure

   10    that Rachel Ellis was your attorney in relation to this

   11    lawsuit ever --

   12       A.    No.

   13       Q.    -- so if she was --

   14       A.    No.  So we calculated damages for the EEOC

   15    complaint.  I don't remember what the number is, and I

   16    don't remember if that carried over to the complaint or

   17    not.

   18       Q.    Sitting here today, you can't tell me what

   19    you're seeking in terms of monetary damages?

   20       A.    I don't recall.

   21       Q.    What would you need to do to recall?  You

   22    understand this is my only chance to talk to you about

   23    this lawsuit, and a key part of the lawsuit is the

   24    damages you're seeking.

   25       A.    I would probably have to look through

Page 211

1     worksheets.  I have no idea.

2              You're referring to a specific number?  Is

3     that what you're referring to?

4        Q.   Yes.

5        A.   Yes.  I don't know that number.

6        Q.   Do you have any general number?

7        A.   I do not.

8        Q.   Do you know what type of damages you're

9     seeking?

10       A.   It would be lost wages.

11       Q.   Anything else?

12       A.   I don't know.

13       Q.   Do you know how you calculated those damages?

14       A.   With a worksheet that Rachel Ellis and her

15    partner provided in March or April of 2015.

16       Q.   Have you ever done any other damage

17    calculation other than in March or April of 2015?

18       A.   At the time that I picked up a new job, and in

19    a small second job, they had me recalculate.

20       Q.   And "they," Ms. Ellis?

21       A.   Yes.  Ms. Ellis and her partner.

22       Q.   So that would have been shortly after, within

23    six months after your termination?

24       A.   Oh, it was pretty quickly, yes, because I

25    began working.  I picked up one job I was working by

Page 212

1    April 1, and then the second job, I was working by

2    sometime in May, so they had me recalculate probably in

3    May or June.

4         **Q.    May or June of 2015?**

5         A.    Correct.

6         **Q.    And since that time, have you calculated**

7    **damages, recalculated damages?**

8         A.    I don't believe so, because nothing had

9    changed in between then and filing a lawsuit.

10        **Q.    So the only thing that you recall sitting here**

11   **today is that you are claiming lost wages?**

12        A.    I don't remember any of this.  I'm sorry.

13        **Q.    We may have to continue your deposition to**

14   **another date to address your damages, but let me go**

15   **take a quick break and see if I can find one thing, and**

16   **then I'll be right back.**

17             **(A break was taken.)**

18             MS. BLUMHARDT:  Okay.  Back on the record.

19   I'm -- that's all I have.

20             THE DEPONENT:  Okay.

21             MR. COAKLEY:  Thank you.

22             MS. BLUMHARDT:  Thank you.

23             MR. COAKLEY:  I have nothing.

24

25

Page 215

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF COLORADO          )
                                 )    ss.
 3    CITY AND COUNTY OF DENVER  )

 4               I, DIANE K. SCHOLL, Registered Merit Reporter

 5    and Notary Public, State of Colorado, do hereby certify

 6    that previous to the commencement of the examination,

 7    the said ROBYN D. ROSS was duly sworn by me to testify

 8    to the truth in relation to the matters in controversy

 9    between the parties hereto; that the said deposition

10    was taken in machine shorthand by me at the time and

11    place aforesaid and was thereafter reduced to

12    typewritten form, consisting of 215 pages herein; that

13    the foregoing is a true transcript of the questions

14    asked, testimony given, and proceedings had.  I further

15    certify that I am not employed by, related to, nor of

16    counsel for any of the parties herein, nor otherwise

17    interested in the outcome of this litigation.

18               IN WITNESS WHEREOF, I have affixed my

19    signature and seal this 16th day of August, 2017.

20          My commission expires September 8, 20  .

21          Diane Scholl

22          Diane K. Scholl, RMR
            Commission No. 20114057677

23

24

25
```

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

*8-6/6/17*
*4:30pn*

# UNITED STATES DISTRICT COURT
for the District of Colorado

| | |
|---|---|
| ROBYN D. ROSS | ) |
| *Plaintiff* | ) |
| | ) Civil Action No. 1:16-CV-01550-KLM |
| v. | ) |
| | ) |
| PROFESSIONAL BUREAU OF COLLECTIONS | ) |
| OF MARYLAND, INC., et al. | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Registered Agent: Susan Hallenberger, Children's Hospital, 13123 E. 16th Avenue, Box B545, Aurora, CO 80045
*(Name of person to whom this subpoena is directed)*

■ *Production:* YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: the medical records (whether in paper or electronic format) pertaining to the visits and treatment of Rory Hurd, DOB: 9/9/2009, from March 1, 2013 through March 1, 2015, relating to a U.S. Department of Labor Certification of Health Care Provider for Family Member's Serious Health Condition (Family and Medical Leave Act) signed by Fred M. Atkins, M.D., Allergy Section Chief, any other notes, correspondence and documents relating to any request for a Family and Medical Leave Act ("FMLA") form or related to FMLA leave information made or requested by Robyn Ross; and any FMLA documentations filled out by, signed by and/or submitted by Fred M. Atkins, M.D., Allergy Section Chief, Children's Hospital Colorado and/or Candie Herschberger, RN, BSN, Clinical Nurse II, Allergy & Immunology, and/or any other medical care provider who treated Rory Hurd.

| Place: McElroy, Deutsch, Mulvaney & Carpenter, LLP 5600 South Quebec Street, Suite 100C, Greenwood Village, CO 80111 | Date and Time: June 26, 2017 at 9:00 a.m., or via email, facsimile or U.S. Mail |
|---|---|

☐ *Inspection of Premises:* YOU ARE COMMANDED to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: June 5, 2017

| | | |
|---|---|---|
| *CLERK OF COURT* | | |
| _____ | OR | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* Kristi Blumhardt |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendants, who issues or requests this subpoena, are: Kristi L. Blumhardt, McElroy, Deutsch, Mulvaney & Carpenter, LLP, 5600 S. Quebec Street, Suite 100C, Greenwood Village, CO 80111, kblumhardt@mdmc-law.com, 303-293-8800

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

DEPOSITION EXHIBIT
Ross 2
HANSEN & COMPANY
8-8-17 DS

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:16-CV-01550-KLM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ___ Registered Agent, Susan Hallenberger, Children's Hospital, on *(date)*_____

☐ I served the subpoena by delivering a copy to the named person as follows:

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $_____ for travel and $_____ for services, for a total of $_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## HIPAA Authorization to Use/Disclose PHI

Patient Name: _Casey Duncan Hurd_

Date of Birth: _9 Sept 2009_

Medical Record #: _____

**Section 1:** I hereby authorize **Children's Hospital Colorado (CHCO)** to release information, as described below, to:

Name of Individual/Organization to receive information: _Eric Coakley_

Address: _2476 Raural Park Blvd Ste 100_

Phone number: _303 303 1111_          Fax number: _____

For the purpose of:  ☐ Continuing Care/Treatment   ☑ Legal   ☐ Personal Use   ☐ Insurance

☐ Other (please describe): _____

**Section 2: Type of records and dates to be released:**

☐ Entire Legal Medical Record

☐ Pertinent Legal Medical Records Only [Including: Provider Progress Notes and Reports, Emergency Dept. Reports, Discharge Summary, Lab/Pathology reports, Imaging Reports, Operative/Procedure Reports, EKG Report]

Other records:

| | | | |
|---|---|---|---|
| ☐ Telephone Consults | ☐ Immunization Record | ☐ Nurses Notes | ☐ Audiology Tests |
| ☐ Clinical Social Work | ☐ ECHO, EEG, EMG, PFT Tests | ☐ Genetic Testing | ☐ Radiology Images |
| ☐ Drug/Alcohol Treatment | ☐ Behavioral Health Records | ☐ HIV/AIDS Records | ☐ Billing Information |
| ☑ Other: | _EE  visits and  Admissions  and any visits  to  Dr Atkins_ | | |

Dates of Services (between): _2013_          and          _2015_

Please Note: The information to be released may include a diagnosis or reference to the following condition(s): behavioral health services/psychiatric care, sickle cell anemia, genetic testing, acquired immune deficiency syndrome (AIDS) or human immunodeficiency virus (HIV); drug and/or alcohol abuse, or sexually transmitted diseases.

*Patient signature required below to release these department specific records:
    Patient age 13 or older: Reproductive health including pregnancy and sexually transmitted disease, HIV/AIDS, or drug/alcohol treatment information.
    Patient age 15 or older: Behavioral health or psychiatric care information.

Release method:  ☑ Paper   ☐ CD (only available for records stored electronically)
Delivery method:  ☐ Mail   ☐ Fax

I understand the following: This authorization will automatically expire 1 year from the date signed below or the date the minor child becomes an adult under state law, unless I request an expiration date sooner than 1 year. I may choose to revoke this authorization at any time, except to the extent that action has already been taken to comply with it, by notifying CHCO in writing. Information disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and is no longer protected by the HIPAA Privacy Rule. I will be provided a copy of this authorization upon fulfillment of the request. CHCO will still provide treatment and seek payment for services provided, whether or not I sign this authorization. CHCO may charge for copies of medical records.

Signature: _____          Date: _7 April 2017_          Signature of Patient (when required): _____

☑ Parent or Personal Representative   ☐ Power of Attorney   ☐ Next of Kin of Deceased   ☐ Executor of Estate

CHCO HIM   •   13123 E. 16th Ave. Box 160, Aurora, CO 80045   •   Ph: 720-777-4258   •   Fax: 720-777-7251
CHCO Radiology   •   Email: radiology.archive@childrenscolorado.org   •   Ph: 720-777-8625   •   Fax: 720-777-7132
ROI @ Briargate   •   Ph: 719-305-9562   •   Fax: 719-305-9702

AUTHORIZATION TO USE OR DISCLOSE PHI
FORM #680330

Rev. 6/2016

Children's Hospital Colorado

Place Patient Identification Label Here

*Rory Hurd*
*1595138*

**Certification of Health Care Provider for**
**Family Member's Serious Health Condition**
**(Family and Medical Leave Act)**

**U.S. Department of Labor**
Wage and Hour Division

 **WHD**

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave to care for a covered family member with a serious health condition to submit a medical certification issued by the health care provider of the covered family member. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees' family members, created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: Professional Bureau of Collections of Maryland, Inc.
Russ Ray Human Resources

**SECTION II: For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your family member or his/her medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave to care for a covered family member with a serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form to your employer. 29 C.F.R. § 825.305.

Your name: Robyn                     Diann                     Ross
First                     Middle                     Last

Name of family member for whom you will provide care: Rory     Duncan     Hurd
First                     Middle                     Last

Relationship of family member to you: Son

If family member is your son or daughter, date of birth: 9-9-09

Describe care you will provide to your family member and estimate leave needed to provide care:

Scheduled pediatrician + specialist doctor appointments,
both in-town and out of state. Emergency care.
Meetings with school staff regarding prevention of anaphylaxis.

Employee Signature _____   Date _____

**SECTION III:  For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** The employee listed above has requested leave under the FMLA to care for your patient. Answer, fully and completely, all applicable parts below. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the patient needs leave. Page 3 provides space for additional information, should you need it. Please be sure to sign the form on the last page.

Provider's name and business address: Dr Fed Atkins MD, 13123 East 16th Avenue
Aurora Co 80045

Type of practice / Medical specialty: Allergy

Telephone: ( 720 ) 777-2675          Fax:( 720 ) 777-7247

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: '3/10/2010

   Probable duration of condition: _____

   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   ___ No  ✓ Yes. If so, dates of admission: 5/15/13 - 5/17/13

   Date(s) you treated the patient for condition: 1/20/14 , 11/24/14

   Was medication, other than over-the-counter medication, prescribed? ___No  ✓Yes.

   Will the patient need to have treatment visits at least twice per year due to the condition?  ___ No  ✓ Yes

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   ✓ No  ___ Yes. If so, state the nature of such treatments and expected duration of treatment:
   However we predict that a consult will
   be ordered with a dietician this year.

2. Is the medical condition pregnancy? ✓ No  ___ Yes. If so, expected delivery date: _____

3. Describe other relevant medical facts, if any, related to the condition for which the patient needs care (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):
   Multiple food allergies with potential for
   sivere allergic Reactions. Patient must
   keep epi-pen available at all times

PART B: AMOUNT OF CARE NEEDED: When answering these questions, keep in mind that your patient's need for care by the employee seeking leave may include assistance with basic medical, hygienic, nutritional, safety, or transportation needs, or the provision of physical or psychological care.

4. Will the patient be incapacitated for a single continuous period of time, including any time for treatment and recovery? ___No ✓Yes.

Estimate the beginning and ending dates for the period of incapacity: *unable to estimate*

During this time, will the patient need care? ___No ✓Yes.

Explain the care needed by the patient and why such care is medically necessary:

*If the child has a severe allergic reaction he will need to be seen by emergency services with potential for hospital admission.*

5. Will the patient require follow-up treatments, including any time for recovery? ___No ✓Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

*unable to estimate as each episode of anaphylaxis presents uniquely.*

Explain the care needed by the patient, and why such care is medically necessary:

*With a severe reaction child would need evaluation by emergency services up to admission.*

6. Will the patient require care on an intermittent or reduced schedule basis, including any time for recovery? ___ No ✓Yes.

Estimate the hours the patient needs care on an intermittent basis, if any: *anytime he has an anaphylactic reaction.*

_____ hour(s) per day; _____ days per week   from _____ ~~and/or~~ through _____

Explain the care needed by the patient, and why such care is medically necessary:

*With severe allergic reactions the child would need emergency care that may or may not need hospital admission.*

7. Will the condition cause episodic flare-ups periodically preventing the patient from participating in normal daily activities? ____ No __✓_ Yes *possible not probable - only an issue if allergenic food is consumed*

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s) *unable to estimate as episodes of anaphylaxis are linked to accidental*

Duration: ____ hours or ___ day(s) per episode *ingestions.*

Does the patient need care during these flare-ups? ____ No __✓_ Yes

Explain the care needed by the patient, and why such care is medically necessary:

*With a severe allergic reaction the child would need emergency medical services which may or may not involve admission.*

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____

_____

_____

_____

_____

_____

_____ *Jane Atkins m* _____          _____ *11/26/14* _____
**Signature of Health Care Provider**          **Date**

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

          Form WH-380-F Revised January 2009

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Colorado Civil Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) **Ms. Robyn Ross** | Home Phone (Incl. Area Code) **(303) 928-9922** | Date of Birth |
|---|---|---|

| Street Address **8248 E. 24th Drive** | City, State and ZIP Code **Denver, Colorado 80268** |
|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name **Professional Bureau of Collections of Maryland, Inc.** | No. Employees, Members **15+** | Phone No. (Include Area Code) **(720) 200-0326** |
|---|---|---|

| Street Address **5295 DTC Parkway** | City, State and ZIP Code **Greenwood Village, Colorado 80111** |
|---|---|

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ PREGNANCY

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **10/25/2013** - Latest **2/9/2015**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I, Robyn Ross, on behalf of myself and others similarly situated, allege as follows:

I.   I am a woman and a mother to a young son with a severe allergy, which requires medical attention in the event of exposure. I worked for Professional Bureau of Collections of Maryland, Inc. (hereinafter "PBCM"), as General Counsel from March 2013 until my wrongful termination on February 9, 2015. Throughout my employment, I performed my duties satisfactorily.

II.  **Sex Discrimination**: PBCM, acting by or through its agents and/or employees, discriminated against me based on my sex in violation of Title VII of the Civil Rights Act of 1964 by, for example: (a) holding me to disparate attendance standards because of my caregiving responsibilities; (b) making derogatory sexual comments to and about women and mothers at PBCM, including me; (c) repeatedly subjecting me to sexual comments; (d) telling me to smile more; (e) comparing femininity to stupidity; and (f) terminating my employment within a week of missing a half day of work because I was at the…
**(Continued on page 2.)**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 4/15/15 _____ Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) 4/15/2015 |



DEPOSITION
EXHIBIT
Ross 3
HANSEN & COMPANY
8-8-17 DS

I

Linnea Constance VanPilsum-Bloom
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID. 20144026...
MY COMMISSION EXPIRES JULY ...
ROSS_000404

Robyn Ross
Charge of Discrimination
Page 2

II.   **Sex Discrimination continued**: ...hospital with my son, who had been admitted due to a severe allergic reaction.

III.  **Retaliation:** PBCM, acting by or through its agents and/or employees, retaliated against me after I complained of discrimination by, for example:  (a) subjecting me to baseless criticism regarding my performance; (b) harassing me about my 9 am to 5 pm schedule; (c) removing time sensitive licensing documents from my control as punishment for turning in FMLA paperwork, then blaming me when the documents were not filed on time; (d) withholding important information regarding the existence of a lawsuit until after the company had defaulted; (e) blaming me when an employee in another state failed to attend a hearing, though I had sent all of the information and a reminder; (f) terminating my employment on February 9, 2015, within a week of missing a half day of work because I was at the hospital with my son, who had been admitted due to a severe allergic reaction; and (g) providing false information to the Colorado Department of Labor in an attempt to justify my termination and prevent me\from receiving unemployment benefits.

   **MY NAME MAY BE USED IN THE PROCESSING OF THIS CHARGE.**

ROSS_000405

EEOC Form 5 (11/09)

| AMENDED CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

Colorado Civil Rights Commission _____ and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Robyn Ross | (303) 928-9922 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 8248 E. 24th Drive | Denver, Colorado 80268 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Professional Bureau of Collections of Maryland, Inc. | 15+ | (720) 200-0326 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5295 DTC Parkway | Greenwood Village, Colorado 80111 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ PREGNANCY

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                Latest
**10/25/2013 - 2/9/2015**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I, Robyn Ross, on behalf of myself and others similarly situated, allege as follows:

I.  I am a woman and a mother to a young son with a severe allergy, which requires medical attention in the event of exposure. I worked for Professional Bureau of Collections of Maryland, Inc. (hereinafter "PBCM"), as General Counsel from March 2013 until my wrongful termination on February 9, 2015. Throughout my employment, I performed my duties satisfactorily.

II.  **Sex Discrimination:** PBCM, acting by or through its agents and/or employees, discriminated against me based on my sex in violation of Title VII of the Civil Rights Act of 1964 by, for example: (a) holding me to disparate attendance standards because of my caregiving responsibilities; (b) making derogatory sexual comments to and about women and mothers at PBCM, including me; (c) repeatedly subjecting me to sexual comments; (d) telling me to smile more; (e) comparing femininity to stupidity; and (f) terminating my employment within a week of missing a half day of work because I was at the...

(Continued on page 2.)

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | *Rochelle R Tafoya* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 4/28/2015        *signature* Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) April, 28, 2015 |

ROCHELLE R TAFOYA
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044043125
MY COMMISSION EXPIRES 12/01/2016

ROSS_000406

Robyn Ross
Charge of Discrimination
Page 2

II.   **Sex Discrimination continued:** ...hospital with my son, who had been admitted due to a severe allergic reaction.

III.  **Associational Disability Discrimination:** PBCM, acting by or through its agents and/or employees, discriminated against me based on my association with a disabled person in violation of the Americans with Disabilities Act, as amended, by, for example: (a) holding me to disparate attendance standards because of my caregiving responsibilities; (b) making derogatory sexual comments to and about women and mothers at PBCM, including me; (c) terminating my employment within a week of missing a half day of work because I was at the hospital with my son, who had been admitted due to a severe allergic reaction; (d) accusing me of taking unauthorized vacation time when I needed to take my son to see a specialist and my request for time off had been properly submitted and approved in advance in accordance with company policy; (e) informing me that I would be under scrutiny as a result of turning in Family Medical Leave Act paperwork.

IV.   **Retaliation:** PBCM, acting by or through its agents and/or employees, retaliated against me after I complained of discrimination, and after I filed Family Medical Leave Act paperwork in order to protect my employment should I need to be away from work to care for my son, by, for example:  (a) subjecting me to baseless criticism regarding my performance; (b) harassing me about my 9 am to 5 pm schedule; (c) removing time sensitive licensing documents from my control as punishment for turning in Family Medical Leave Act paperwork, then blaming me when the documents were not filed on time; (d) retroactively holding a previously resolved issue against me because I filed Family Medical Leave Act paperwork; (e) withholding important information regarding the existence of a lawsuit until after the company had defaulted; (f) blaming me when an employee in another state failed to attend a hearing, though I had sent all of the information and a reminder; (g) terminating my employment on February 9, 2015, within a week of missing a half day of work because I was at the hospital with my son, who had been admitted due to a severe allergic reaction; (h) providing false information to the Colorado Department of Labor in an attempt to justify my termination and prevent me from receiving unemployment benefits; (i) appealing the Colorado Department of Labor's award of unemployment benefits to me, then refusing to appear or produce documents after being served with subpoenas.

        MY NAME MAY BE USED IN THE PROCESSING OF THIS CHARGE.

2

ROSS_000407



# Operations Procedure #P-8
## ABSENTEEISM & TARDINESS
..................................................

To:  All Collection Employees
From: Erik Brechbill, Operations Manager
Date: 1-07-2013

PBC strictly enforces the attendance policy set forth below.

Once tenure requirements are fulfilled, full-time employees of PBC are provided with paid vacations and paid holidays. Please refer to Operations Procedure #P-11 for further details. Absenteeism that does not fall within the guidelines of these policies is considered unauthorized and will be subject to disciplinary action which may result in termination.

PBC strictly prohibits tardiness. All employees are expected to arrive to work "on time." Any employee experiencing difficulty in arriving to work on time must call the office to notify their immediate supervisor at once.

If an employee is unable to report to work on a particular day, the immediate supervisor must be notified of the situation as soon as possible. All calls are to be made personally by the employee to explain the reason for the tardiness or absenteeism. Calls will not be accepted from a third party. Employees are prohibited from leaving messages regarding their absence on the company voice-mail, with the company receptionist or with a co-worker. The employee must speak to his/her immediate supervisor. Any employee who fails to properly report their tardiness or absenteeism will be subject to disciplinary action which may result in termination.

Employees who are absent from work due to illness for two consecutive days or longer must provide a written doctor's excuse to management the following day. If the employee fails to provide the required documentation within 24 hours of the absence, management will have the authority, in its sole discretion, to discipline or terminate the employee.

For the purposes of this paragraph, "Attendance Issue" shall mean any absence or tardy. During an employee's first ninety-day period of employment, each employee will be allowed only TWO Attendance Issues with the third absence being cause for discipline up to and including termination. During an employee's first calendar week of employment each employee will be allowed only ONE attendance issue second being cause for discipline up to and including termination. An employee is allowed only FOUR absences within a calendar year of employment. Upon the occurrence of a fifth absence, management will have the authority, in its sole discretion, to discipline or terminate the employee.

No employee is allowed to make up time missed from work unless required to do so by management. Any employee who misses time may be required at manager's discretion to work the upcoming Saturday morning; regardless if the employee was scheduled to work that particular Saturday. In addition, if the employee who missed time during the week worked the previous Saturday and would normally leave early on Friday, the employee is required to work an eight hour day Friday or work until a 40 hour work week is completed.

PBC interprets a failure to report for work and/or call in to report an absence at or before the start of the scheduled shift as a job abandonment from the employee.

I have read and understand the above.

_____          3-29-2013
(Employee Signature)                                          (Date)

_____
Robyn Ross
(Employee Name – Please Print)

PBCM 00085

*CONFIDENTIAL*

DEPOSITION
EXHIBIT
Ross  4
HANSEN & COMPANY
8-8-17 DS



# Operations Procedure #P-15
## SEXUAL HARASSMENT POLICY

To:   All Collection Employees
Frm:  Linda Justus, Executive Vice President
Date: 1-1-2010

### POLICY AGAINST HARASSMENT

PBC is committed to providing a work environment free of harassment. PBC prohibits sexual harassment, and harassment based on pregnancy, childbirth, or related medical conditions, race, religious creed, color, national origin or ancestry, physical or mental disability, marital status, age, sexual orientation, gender identification or any other basis protected by federal, state, or local law or ordinance or regulation. PBC's anti-harassment policy applies to all persons involved with PBC and prohibits harassment by any employee or independent contractor of PBC, as well as outside persons having contact with the PBC's employees.

This policy is intended to serve as a workplace rule that sets the standard of expected behavior for all employees and various third parties while in the workplace. PBC will not tolerate harassment or discrimination of any kind, either against co-workers, independent contractors, customers, or any other outside person(s) having contact with PBC.

Harassment includes verbal, physical and visual conduct where:

1)      Submission to the conduct is made either an explicit or implicit condition of employment or business, service or professional relationship;

2)      Submission to or rejection of the conduct is used as a basis for an employment decision or decision affecting the terms of a business, service or professional relationship;

3)      The harassment interferes with work performance or creates an intimidating, hostile or offensive work environment. It can take many forms and includes, but is not limited to, the following: slurs, jokes, statements, email messages, gestures, assault, impeding or blocking another's movement or otherwise physically interfering with normal work, pictures, drawings or cartoons based upon sex, race, color, national origin, religion, age, physical disability, mental disability, medical condition, ancestry, marital status, sexual orientation, family care or medical leave status, veteran status or any other basis protected by law; or;

4)      Retaliation taken against an individual for reporting or threatening to report harassment.

Sexual harassment, in particular, refers to all of the prohibited conduct described above, as well as unwelcome conduct such as requests for sexual favors, conversation containing sexual comments and other unwelcome sexual advances. Sexually harassing conduct includes any prohibited conduct performed by a person of either the same or opposite sex as the person who is the subject of the harassment.

PBCM-00001

*CONFIDENTIAL*

DEPOSITION
EXHIBIT
5
Ross
HANSEN & COMPANY
8-8-17 DS

## REPORTING HARASSING CONDUCT TO THE COMPANY

If you believe you have been harassed or have witnessed an incident of harassment, submit an oral or written complaint to your own or any other PBC Manager, or Management, within three (3) calendar days of the offense. Employees are not required to approach the person who is harassing and/or discriminating against them, and they may bypass any offending member of management.  The conduct of concern can also be submitted in writing to the following address:

Professional Bureau of Collections of Maryland, Inc.
Attn: Human Resources
5295 DTC Parkway
Englewood, CO 80111

Your complaint should include details of the incident or incidents, names of the individuals involved, and names of any witnesses. PBC will conduct its investigation in as confidential a manner as possible. Interviews, allegations, statements, and identities will be kept confidential to the extent possible and allowed by law. However, PBC will not allow the goal of confidentiality to be a deterrent to an effective investigation.

It is the obligation of all employees to cooperate fully in the investigation process. In addition, disciplinary action will be taken against any employee who attempts to discourage or prevent any harassment victim from using the PBC's complaint procedure to report harassing conduct.

If it is determined that harassment has occurred, effective remedial action will be taken in accordance with the circumstances involved. Any employee determined by PBC to be responsible for harassment will be subject to appropriate disciplinary action, up to and including termination.  A timely resolution of each complaint will be reached and communicated to the employee.

PBC prohibits retaliation of any kind against employees, who, in good faith, report harassment and/or discrimination or assist in investigating such complaints. If an employee feels he/she has been subjected to any form of retaliation, the employee should report that conduct to his/her immediate supervisor, another member of management, or Human Resources within three calendar days of the offense. Employees are not required to approach the person who is retaliating against them, and they may bypass any offending member of management.  An investigation in accord with the above procedures will be conducted.

PBC encourages all employees to report any incidents of harassment forbidden by this policy immediately so that complaints can be quickly and fairly resolved.

Any employee who is determined, after an investigation, to have engaged in violation of this policy will be subject to severe discipline leading up to and including termination.

I have read and understand the above.  I have watched the video regarding this material.

_(signature)_ _____     3.29.2013

(Employee Signature)                      (Date)

Robyn Ross

(Employee Name – Please Print)

PBCM 00092

*CONFIDENTIAL*